WILLIAM YOUNG & CO.

*v.*

SAMUEL WARD *et al.*

*Filed at Ottawa November 14, 1885.*

1. FRAUDULENT CONVEYANCE—*facts in the particular case, as showing a fraudulent purpose.* In this case the court state and discuss facts and circumstances in evidence, from which it holds that certain conveyances, and an assignment of a debtor's interest in lands, and a sale of goods, were fraudulent as to creditors, reversing the decree of the trial court.

2. SAME—*removal of prior incumbrance by fraudulent grantee—right of subrogation.* A debtor in failing circumstances fraudulently conveyed his interest in lands, upon which were *bona fide* incumbrances and liens, to his sons-in-law, who were cognizant of the intent to defraud creditors, some of whom, after such conveyances, having satisfied and discharged some of the incumbrances, in whole or in part: *Held,* that the court, in setting the conveyances aside, as having been made in fraud of creditors, should refer the cause to the master to state an account of the rents and profits, and ascertain what, if any, part of the incumbrances had been discharged since the making of the fraudulent transfer, and also the date and amount of all payments for such purpose, and the name or names of the persons making such payments, and report the same, and in the final decree subrogate the parties so paying to the rights of the parties holding such incumbrances paid.

3. SAME—*rights of creditors of fraudulent assignor—declaration of forfeiture by vendor.* A party holding a contract for the sale and conveyance of land, providing for certain payments in the future, fraudulently assigned the same to a son-in-law, to defraud creditors, the assignee paying nothing for the assignment. Shortly after such transfer, creditors of the assignor attached the land, when the vendor declared a forfeiture of the contract for non-payment of an installment of the purchase money, in violation of his agreement with the assignee to give further time: *Held,* that after the rights of the creditors had attached, the vendor could not declare a forfeiture without a reasonable notice to the attaching creditors.

APPEAL from the Appellate Court for the Second District; —heard in that court on appeal from the Circuit Court of Grundy county; the Hon. GEORGE W. STIPP, Judge, presiding.

Messrs. BISBEE, AHRENS & DECKER, for the appellants.

Messrs. HILL & DIBELL, for the appellees Small and Finch.

Mr. S. C. STOUGH, for the appellee Thos. Walsh.

Mr. CHIEF JUSTICE MULKEY delivered the opinion of the Court:

The present appeal brings before us for review a judgment of the Appellate Court for the Second District, affirming a decree of the circuit court of Grundy county, denying relief upon a bill in the nature of a creditors' bill, filed by the appellants, Wm. Young & Co., against the appellees, Samuel Ward and others.

The record is very voluminous, and has cost us much labor in endeavoring to arrive at a clear apprehension of the true merits of the controversy. The difficulty we have encountered in trying to accomplish this object has resulted mainly from the unsatisfactory character of the testimony of two or three of the most important witnesses. Some of their statements are obscure and meaningless, while others, sufficiently clear and explicit, are inconsistent and contradictory. The vast amount of testimony which has been taken in the cause, and its peculiarities in the respects stated, absolutely forbid any attempt on our part, even if it were otherwise desirable, to discuss it in detail. We shall therefore content ourselves with giving a general outline of the case as we have been able to gather it, under the circumstances stated, together with such special details as may be deemed necessary to a correct understanding of the conclusion we have reached with respect to the rights of the parties.

It appears from the record, that in the month of April, 1878, Samuel Ward and William Scott Pierce, merchants and dealers in live stock, lumber, etc., at Verona, Grundy county, this State, with a view of transferring their Chicago commission business from the house of E. Hopkins, with whom they were then doing business, to that of Wm. Young & Co., delivered to the latter a written statement touching their financial condition. From this statement, which purported to

set forth specifically the assets and liabilities of the firm of Ward & Pierce, it appeared the assets aggregated $36,629, and the liabilities $14,200, leaving a balance of $22,429, assets, in their hands, in excess of all liabilities. Of the liabilities specified, there was an item of $7000 due the said E. Hopkins, secured as follows : Judgment note, signed by Ward & Pierce, principals, and William Pierce, Thomas Walsh, Rudolph Hill and Wilson Small, sureties, for $3000, dated January 24, 1878, and payable to E. Hopkins, nine months from date, with interest at ten per cent per annum. The remaining $4000 was secured by bill of sale in the nature of a chattel mortgage upon five cribs and 20,000 bushels of corn, in the town of Verona, dated March 29, 1878, and acknowledged before a justice of the peace, and recorded in the proper office of the county. Upon this favorable showing, appellants, on the 7th of May following, advanced to Ward & Pierce $1000 cash, taking from them a judgment note therefor, secured by a crib-receipt for 4000 bushels of corn. This transaction was conducted, on the part of Ward & Pierce, by Ward himself, who assured appellants, at the time, that he was individually worth from $18,000 to $20,000. On the 14th of the same month, appellants, at the request of Ward & Pierce, took up the two claims above mentioned, held by Hopkins against them, and took an assignment of them to themselves. The principal and interest of these two claims, —that is to say, the $3000 note of the 24th of January, 1878, and the $4000 secured by the bill of sale of the 29th of March, 1878,—amounted in the aggregate to $7443.83.

The statement of Ward & Pierce to appellants, above mentioned, respecting their financial condition, and upon which their subsequent business transactions were based, is clearly shown to have been false in many essential particulars, and to such an extent as to leave no doubt that it was intended to deceive and mislead appellants ; and that the latter were thereby so deceived and misled to their injury, is also equally

clear. In the list of assets contained in the statement, there is an item of two hundred and ninety acres of land, valued at $45 an acre, making $13,000. The truth is, as partners they owned no land at all, nor was Pierce individually, or otherwise, the owner of any real estate, except, as he states, about twenty acres, not mentioned in the statement. Ward himself owned in fee, at the time, subject to certain incumbrances, two hundred and one and one-half acres, consisting of two tracts,—one of eighty-eight and one-half acres, and the other of one hundred and thirteen acres. He also was the equitable owner of another tract of sixty acres, originally purchased by him of one Roberts, for $1800. Of this amount, Ward paid out of his own means $800 cash, and borrowed the remaining $1000 of James Seamark to complete the payment, and by arrangement between the parties, the deed was made to Seamark to secure the loan to Ward. The latter took possession of the land, and enjoyed the rents and profits for about ten years, without anything having been paid on the principal, and even the interest was in arrears. The matter stood in this condition until the 1st of March, 1878, when it seems to have been settled up by the execution of another instrument in the form of a contract of purchase and sale, by which Ward agreed to pay to Seamark, for the land, the principal sum of $1000, as follows: $100 November 1, 1878, $300 November 1, 1879, $300 November 1, 1880, and a like sum November 1, 1881, upon the payment of which sums Seamark was to convey to Ward.

On the first of September, 1878, Samuel Ward executed to Wilson Small a mortgage on lot 1, block 2, Finch's addition to the town of Verona, to secure $390, for which Ward gave a note at the time. Ward himself testifies, in respect to this transaction, that all Wilson Small claimed to be due him was between $150 and $250, and that he (Ward) did not know, of his own knowledge, that Ward & Pierce owed him anything. He further says, in explaining why the note was given for $390,

that there was something said about indemnifying Small as security on the $3000 Hopkins note, which was subsequently paid by William Scott Pierce, though Thomas Walsh claims to have advanced $1500 of the money.

On the 10th of September, 1878, Ward, for the expressed consideration of $1000, executed a deed to appellee Thomas Walsh, for the eighty-eight and one-half acre tract of land above mentioned, which, for convenience, will be called the Walsh tract. It was, at the time, subject to a mortgage known as the Hyde mortgage, amounting originally to $1500. This mortgage was given on the 27th of October, 1873, and is considered to have been a *bona fide* transaction. By another deed, executed at the same time, for the expressed consideration of $560, Ward also conveyed to Walsh a part of lot 13, block 1, Kinsley's plat to the town of Verona. On the same day Ward executed to Millard Small a deed for the one hundred and thirteen acre tract above mentioned, known as the Small tract, for the expressed consideration of $760. This tract was also subject to a mortgage, originally given to the Morris Bridge Co., for $3000, and is conceded to have been a *bona fide* claim. Ward, at the same time, assigned,—or, rather, attempted to assign,—to Small the Seamark contract above mentioned. Through inadvertence he omitted to attach his signature to the written assignment, and it was recorded in that condition. In the following month, Ward added his signature to the instrument, and it was re-recorded. The three deeds above mentioned, as well as this assignment, were, at the request of Ward, prepared by and acknowledged before Scott Pierce, who was a notary public, at the office of Ward & Pierce, no other persons being present. Walsh and Small, the grantees in these deeds, and Pierce, who took the acknowledgments, were all sons-in-law of Ward, and the latter declined to acknowledge them before a justice living near by, for the reason, as he stated at the time, he wanted the matter kept a secret. After the execution and acknowledgment of

these deeds, Ward took possession of them, and carried them away with him.

According to Pierce this transaction commenced on the morning of the 10th, at the office of Ward & Pierce, in Verona. Pierce states that when Ward requested him to prepare the deeds, he asked him, "What are you doing this for?" to which Ward replied, "I don't see, after thinking things over, how in the world we are going to pay our debts, and I am old and can not work, and am going to save something if I can." Small testifies that he first learned that Ward had made a deed to him, on the 16th, the day before it was put on record, although he claims to have had a conversation with Ward about the Seamark tract on the 14th. Just when Walsh's deeds were delivered does not satisfactorily appear, though all three of the deeds, together with ·the Seamark contract, were taken by him to Morris, and filed for record on the 17th. Small, in speaking of his first interview with Ward, in respect to the purchase made by him, says that he met him on the 10th, in the forenoon, at Ward & Pierce's office, and that Ward "wanted him to buy the place," and assigned as a reason that "corn was low, and they had a good many expenses, and he wanted to sell it to take off some of the expense, so that it would pay Small what he owed him." Not stopping to comment upon the logic or perspicuity of this statement, it will not be improper to call attention here to the fact that Small's statement, to the effect that he visited the office of Ward & Pierce on the 10th, and had an interview with Ward on the subject of the purchase of the land, is not altogether in accord with the statement of Pierce in his account of what occurred at the office on the morning of that day. Pierce, in that connection, says: "Neither Thomas Walsh nor Millard Small were present. They nor either of them were in Verona that day, to my knowledge. *They did not come to the office that day.*"

In the afternoon of the 17th, and subsequent to the filing for record the instruments above mentioned, Ward & Pierce confessed a judgment in the Grundy circuit court in favor of William Pierce, an uncle of Scott Pierce, for $3137.79, *including an attorney's fee of $285.25.* This judgment was confessed in vacation, upon a promissory note, with a regular cognovit attached, purporting to have been executed by Ward & Pierce to the said William Pierce, on the 2d day of September, 1878, for the sum of $2878, payable one day after date, with interest at *ten per cent per annum,* and if not paid at maturity, twenty-five per cent per annum as liquidated damages. At four o'clock in the afternoon of the same day an execution was issued on this judgment, and on the following day was levied on the warehouse, office and scales at Verona, and also upon about 3000 bushels of corn, together with a large amount of other goods and effects, as the property of the defendants in the execution. In the meantime important events had transpired at Verona. Walsh claims that before going to Morris on the 17th, he had agreed with Ward & Pierce to purchase their stock of goods at $2000, provided he could raise the money, and if his statements are to be credited, his trip to Morris was altogether successful. He not only got his own deed, and that of his brother-in-law, recorded in advance of all other liens, but he also succeeded in making up the $2000 to complete his purchase of the stock of goods, which he promptly paid over to Ward & Pierce on his return to Verona, and took formal possession of the store, thereby obtaining precedence over William Pierce's execution, possession having been taken perhaps about an hour before the execution was delivered to the officer. The appellants were kept in total ignorance of what was going on at Verona from the 1st to the 16th of the month, during which time, as we have just seen, all the available means of the firm of Ward & Pierce had been fully administered and divided out between the sons-in-law of Ward and the uncle of Pierce. But this is not all. During

the very time all this was being done, Ward & Pierce were almost daily drawing money from the appellants, just as though nothing unusual had taken place. The several sums so obtained between the 1st and 16th, aggregated $3458.59, $548.53 of which amount was obtained from appellants on the day last mentioned. We doubt whether the history of business transactions affords a more striking illustration of an utter disregard for the principles of honor and honesty that ordinarily obtain among business men.

On the 19th of the month, appellants, with a view of saving something out of the general wreck, entered up a judgment by confession against Ward & Pierce, for $1086.66, on the $1000 note executed by them to appellants on the 7th of May, as heretofore stated, and caused an execution to be issued thereon, which, on the following day, was levied on the Walsh, Small and Seamark tracts of land, and also on certain lots in Verona. A like judgment was also entered up by appellants on the $3000 Hopkins note, which was taken up by them at the request of Ward & Pierce, as heretofore stated. But as Walsh was a surety on that note, and consequently a party defendant to the judgment, it became necessary for his protection that it should be paid, and it was accordingly paid about three days thereafter. One-half of the amount, it is conceded, was paid by Ward and Pierce, and Walsh claims to have paid the balance. This last judgment was entered on the 23d, and on the same day appellants brought an action of replevin against the sheriff and his deputy to recover the goods and effects held by them under the William Pierce execution, and the property was accordingly replevied on that day. At the same time, appellants commenced an action of assumpsit against Ward & Pierce, and on the 25th, sued out an attachment in aid of the suit, which was also levied upon the lands above mentioned. Pending these suits, the present bill was filed, for the purpose of having the whole matter in controversy settled in one suit.

Millard Small, having got possession of the Seamark contract, failed to make the first payment, which, as we have seen, became due on the 1st of November, 1878.    Small swears that he went to Seamark a day or two before the payment became due, and told him he could not raise the money for a few days, and asked him if it would make any difference to him.    He said it would not—that he did not want to hurry anyone—that it would be all right.    Nevertheless, on the 2d of November, but a day or two afterwards, Seamark delivered to Ward an instrument in writing, declaring the contract forfeited.    When asked shortly afterwards by Small why he had declared a forfeiture after making the statement to him he had, Seamark replied *"that it would be all right."*    As an evidence of Small's confidence in this promise of Seamark, on the 21st of March, 1879, he generously released upon the record all his interest in and to the land in question; yet he admits, himself, that he afterwards lived upon it without any understanding with Seamark as to how much rent he was to pay him for it.    Not long after this entry was made upon the record, Seamark, true to his promise that it would be all right, conveyed the land to Martin Finch, another son-in-law of Ward.    The land being again in the Ward family, Ward himself, in a short time thereafter, moved upon it, claiming to have purchased a homestead in it, and was living upon it when he died, in 1883, and so far as this record shows, one of his sons is still in the occupancy of it.    As Small never paid anything for this land upon the transfer to him, he held it in trust for the benefit of Ward's creditors, subject to the incumbrance of $1000 held by Seamark.    The levy of appellants' attachments created liens upon it, subject to the incumbrance, which were not defeated by Seamark's attempt to declare a forfeiture.

Waiving the view that the original conveyance to Seamark was, in law, a mere mortgage, and that the right to redeem could not be barred by a mere change of the form of the

security, it is clear Seamark was in no position to declare a forfeiture. He had promised Small, who was then the holder of the equitable title in trust, that he would extend the time, and he could not thus suddenly cut off the right to redeem or make payment under the contract; and although Small, for reasons quite apparent, attempted to ratify what Seamark had done in that respect, yet neither the individual nor joint action of these parties could affect the rights of creditors which had already attached to the land. Under the circumstances of this case, before a forfeiture could have been declared as against them, conceding it could have been done at all,— about which we express no opinion,—they would have been entitled, in any event, to reasonable notice. The Wilson-Small mortgage is confessedly a fraud, and is but a fitting commentary upon the manner in which the business of the firm was closed out. As to the judgment note of William Pierce, which was given by Ward & Pierce when the partnership concern first commenced collapsing, it need not be considered now, except so far as it throws light upon the conveyances of the real estate, and except so far as it may constitute a part of a general scheme to defraud the creditors of the firm. In this view, William Pierce's testimony is important, but we can not stop to analyze it. The note is claimed to have been given almost exclusively for borrowed money. Pierce testifies that he kept no account with the firm. In this particular he is like Walsh and Small. Neither of them kept any accounts. But when the crash came vouchers were readily furnished by the failing firm. It is hardly necessary to remark that money lenders do not usually do business in this way. These parties all lived in the immediate neighborhood of Ward & Pierce, and, from their own testimony, were constantly brought in business contact with each other. This, when taken in connection with the fact that they were close relations, affords almost irresistible evidence that they must have known that Ward & Pierce were deliberately trying to defraud their cred-

18—115 ILL.

itors, and turn over all their available effects into the hands of their relations. The evidence shows, beyond all controversy, that Thomas Walsh, with the assistance of Ward and his employes, between the 1st and 16th of September, 1878, shipped from the pens of corn covered by appellants' bill of sale, between 3000 and 4000 bushels of corn, when, at the same time, Ward & Pierce, as we have already seen, were receiving, day by day, remittances from Wm. Young & Co., amounting in the aggregate to thousands of dollars. It would be a reproach to the law and the courts of the country if such transactions as these could be sustained. If Walsh did not know Ward & Pierce were trying to defraud their creditors, why in such a hurry to run off the corn? What was it that so suddenly quickened his movements on the subject? The only pretence for taking it was an old claim against Ward & Pierce for corn delivered in their warehouse in 1876, which seems to have been opportunely resurrected as a thin covering for the manifest trespass upon appellants' rights.

Though half has not been said that might be on this subject, we must forbear to pursue it further.

The decree in this case, so far as it affects the appellants, both upon the original and supplemental bills, we regard as essentially erroneous.

The conveyances and assignment made by Ward to his sons-in-law on the 10th of September, 1878, we hold to be fraudulent and void as against appellants, and the decree as to this property, both upon the original and supplemental bills, is consequently erroneous, and must be reversed and set aside. The property so transferred and assigned, subject to the *bona fide* incumbrances heretofore indicated, continued liable for Ward's debts. On re-docketing the cause in the circuit court, it should be referred to the master to state an account with respect to the rents, profits, etc., with directions, also, to ascertain what, if any, part of the incumbrances above mentioned as valid liens upon the property in question,

has been discharged since its transfer to Small and Walsh·on the 10th of September, 1878, and also the date and amount of all payments for such purpose, and the name or names of the person or persons making such payment or payments, and when so ascertained, to report the same to the court. And if, upon the coming in of such report, it shall be made to clearly appear that Walsh, Small or Finch paid the same or any part thereof, then either of said parties so paying is to be subrogated to the rights of the party or parties holding the incumbrance so paid. In taking this account with respect to the Seamark tract, the balance of $1000, with legal interest, alone, is to be treated as an incumbrance, taking the contract assigned to Small on the 10th of September as the basis of the computation.

The decree of the circuit court, and the judgment of the Appellate Court affirming the same, are reversed, and the cause is remanded to the circuit court for further proceedings not inconsistent with this opinion, and in conformity with such directions as are therein contained.

*Judgment reversed.*